## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) ORIGINAL REX, L.L.C., an Oklahoma Limited Liability Company, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 2010-CV-424-GKF-FHM |
| 1) BEAUTIFUL BRANDS INTERNATIONAL, LLC, 2) REX'S FRANCHISE SYSTEMS, LLC, 3) BERRY CHIC-A-LO, LLC, 4) BIG REX, LLC, and 5) CONEY BEACH, INC,, | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

### PLAINTIFF'S OBJECTION TO DEFENDANTS' COMBINED MOTION TO QUASH SUBPOENA DUCES TECUM AND DEPOSITION SUBPOENA

The Plaintiff, Original Rex, LLC ("Original Rex"), by and through its counsel of record, submits the following objection to the *Defendants' Combined Motion to Quash Subpoena Duces Tecum and Deposition Subpoena* ("Motion to Quash").

### Summary of Arguments

Defendants' Motion to Quash asserts four propositions:

(1)  The subpoenas should be quashed pursuant to Rule 45(c)(3)(iii) because they require disclosure of matters protected by the Attorney-Client Privilege;
(2)  The subpoena *duces tecum* should be quashed pursuant to Rule 45(c)(3)(iii) because it requires disclosure of matters protected as Attorney Work-Product;
(3)  The subpoenas should be quashed pursuant to FRCP 45(c)(3)(iv) because compliance would subject movants to an undue burden; and
(4)  Alternatively, the subpoena *duces tecum* should be modified.

Original Rex does not dispute that much of the information that it seeks to discover via the subpoenas constitutes information that would normally be protected by either the attorney

client privilege or work product doctrine. However, because defendants have voluntarily disclosed information on certain subjects that would normally be protected by either the attorney client privilege or work product doctrine, they have waived the attorney client privilege and/or work product protection for any testimony or documents that relate to the same subject matter. Alternatively, defendants have placed such information at issue, and have waived the privilege and/or protection that might otherwise be available. The subpoena for documents is not unreasonably broad, since it is limited to documents that are relevant to the subject matter of the facts that have been disclosed by defendants' interrogatory answers and deposition testimony. The Court should not modify the scope of the subpoenas to preclude discovery of testimony and documents subject to the attorney client privilege or work product protection since defendants have waived the attorney client privilege and work product protection for the testimony and documents sought via the subpoenas.

## **Introduction**

This is an action for trademark infringement, false designation of origin, false advertising, and unfair competition, in violation of sections 32(1) and (2) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)-(2), 1125(a) (2006) and OKLA. STAT. tit. 78, §§ 21-33; for dilution of Original Rex's trademark in violation of section 43(c) of the Lanham Act, 15 U.S.C.A. § 1125(c) (2006); for deceptive trade practices in violation of OKLA. STAT. tit. 78, § 53; and for unfair competition unde r the common law of Oklahoma.

Defendants' state of mind regarding their appropriation and use of Federal Trademark Registration 1,633,536 for REX and design and other common law trademarks ("the REX Marks") is an issue which permeates this litigation:

- "Evidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident, typically supports an inference of likelihood of confusion." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research,* 527 F.3d 1045, 1055 (10th Cir.2008);

- An award of profits, in a trademark infringement case, requires a showing that defendant's actions were willful or in bad faith. *Bishop v. Equinox International Corp.,* 154 F.3d 1220, 1223-24 (10th Cir.1998)[

- Attorneys' fees may be awarded to the prevailing party in Lanham Act cases only in "exceptional" cases, 15 U.S.C. § 1117(a), which has been defined as one in which the trademark infringement is "malicious, fraudulent, deliberate, or willful." *VIP Foods, Inc. v. Vulcan Pet, Inc.,* 675 F.2d 1106, 1107 (10th Cir.1982);

- Under the Oklahoma Deceptive Trade Practices Act, the Court may award attorneys fees to a prevailing plaintiff upon proof "that the defendant has willfully engaged in a deceptive trade practice." OKLA. STAT. tit. 78, § 54.

In order to obtain discovery regarding defendants' good faith, or lack thereof, in selecting "Rex's Chicken" as a trademark, Original Rex served interrogatories on defendants, and among those interrogatories was the following, attached as Exhibit "A":

> **INTERROGATORY NO. 1:** Describe any investigative efforts which you conducted regarding the prior use of the REX name (or instructed others to conduct on your behalf) prior to your decision to adopt the REX name in connection with your goods or services, including, without limitation, the following information:
>
> a. Identify the person or persons conducting any such investigation;
> b. Provide the date or dates upon which such investigation was conducted;
> c. Describe with reasonable particularity the nature of the information which the investigation disclosed;
> d. Produce any documents which were obtained during the investigation; and
> e. Produce any documents generated during the investigation, including but not limited to notes and emails.

Defendants responded to the foregoing as follows:

> RESPONSE:  Defendants specifically object to potentially calling for information protected from disclosure by an applicable privilege including without limitation the attorney-client and work product privileges.  Defendants specifically object to that portion of this Request that seeks the production of documents, notwithstanding such objection all non-privileged and responsive requested documents, to the extent they exist and are in Defendants' possession, custody or control, are included in Defendants' Response to Plaintiff's First Request to Defendants for Production of Documents and Things.  Subject to the specific objections herein and the General Objections above and without waiving any objections, including privilege, Defendants state:
>
> Branch and Sabatini have no knowledge of the fact to which Plaintiff seeks a response.
>
> RFS states that in June and July of 2006, BBI became interested in the possibility of opening a franchise concept under the name Rex's Chicken.  *Barrow & Grimm, P.C. ("B&G"), legal counsel for BBI, searched Oklahoma Secretary of State records and discovered numerous entities with the name Rex.  Among such companies, B&G reasonably believed the following were connected with the former operation of restaurants using some form of "Rex" name:  Rex's Inc., Rex Chicken Company, Rex Franchising Systems, Inc., and Rex Chicken, L.L.C.  All of said entities were either terminated or cancelled by the Oklahoma Secretary of State, with Rex Chicken, L.L.C. being the last such entity cancelled in 2005.  Oklahoma Secretary of State records did not have contact information for any of the principals listed in connection with Rex Chicken, L.L.C., however, an attorney named Timothy M. Larson ("Larson") was named as the Registered Agent for the entity.*
>
> *In early July of 2006, B&G contacted Larson about Rex Chicken, L.L.C.  Larson indicated that the former owners of Rex Chicken, L.L.C were not the same individuals as those who operated "Rex" restaurants in Tulsa, however, he did indicate that the operations were related.  B&G requested Larson have a former owner of Rex Chicken, L.L.C. contact them, and no one on behalf of Rex Chicken, L.L.C. ever made contact with B&G or Rutkauskas.*
>
> *B&G's search of former "Rex" restaurant information revealed the name "Rex Chicken" listed as a previous d/b/a of AAA Enterprises, Inc. which was connected to the bankruptcy filing of Troy Clifton Beats ("Beats") in 2002 in the U.S. Bankruptcy Court for the Northern District of Oklahoma, Case No. 02-02084-R.  B&G contacted Beats who represented he was the last franchisee who operated restaurants under the "Rex" name.*
>
> *On August 31, 2006, B&G and David Rutkauskas ("Rutkauskas") met with Beats to discuss the former "Rex" restaurant operations.  At this meeting Beats represented that he had "cooked more Rex chicken than anyone, except for Dollie [McFarland]."  Beats represented that Dollie McFarland sold all her rights to the Rex name in 1993 to a group on Oklahoma City who "shut Rex chicken down" in 1999 or 2000.  Beats further represented that Rex chicken was "gone."  Beats offered to help Rutkauskas in any way he could.  Over the next approximately eighteen (18) months, B&G assisted Rutkauskas in attempts to negotiate a consulting agreement with Beats for instruction on chicken spicing, processing and cooking.  These negotiations failed in January of 2008, and Rutkauskas, BBI, and/or RFS had no future contact with Beats.*

4

    On January 11, 2008, BBI formed Rex's Chicken, Inc., an Oklahoma corporation. The corporation's name was chosen by Rutkauskas, and the name was considered "available" by the Oklahoma Secretary of State, because all other business entities' with an identical or substantially similar name were either "terminated" or "cancelled" according to the Oklahoma Secretary of State records.  Thereafter, BBI began developing a restaurant concept under the name "Rex's Chicken." On October 14, 2008, BBI formed Rex's Franchise System, LLC.

    In September and October of 2008, RFS, sought trademark registration with the U.S. Patent and Trademark Office ("USPTO") for marks incorporating "Rex's Chicken." *B&G discovered prior abandoned and/or cancelled USPTO trademark registrations using the name "Rex" in commerce in connection with restaurant services.  Among such registrations were USPTO Reg. No. 1639311 and Reg. No. 2321447.  B&G did not discover Reg. No. 1633536.  B&G also discovered Oklahoma trademark Registration No. 29935 for "REX CHICKEN and Design," in the name of the cancelled entity Rex Chicken, L.L.C.  Such state registration was due to expire on February 23, 2009.*

    On October 24, 2008, RFS filed USPTO trademark application Serial No. 77599822 for the text mark "Rex's Chicken" (the "RFS Text Application") and USPTO trademark application Serial No. 77599898 for the stylized log mark "Rex's Chicken since 1951" (the "RFS Logo Application").  Both filings were on an "intent to use" basis. On Jun 23, 2009, the USPTO granted a Notice of Allowance for both the RFS Text Application and the RFS Logo Application.  At no point during the USPTO trademark examination process was RFS notified by the USPTO of the existence of any potentially conflicting applications or registrations.   Subsequent to the Notices of Allowance, RFS abandoned the RFS Logo Application because RFS elected to change its logo design. RFS did not abandon the RFS Text Application.

    In June of 2008, RFS authorized Coney Beach, Inc., to offer for sale, at its "Coney Beach" restaurant located at 11089 South Memorial Drive, Tulsa, OK  74133 (the "Location"), a chicken product called "Rex's Chicken."  Coney Beach, Inc. ceased operations at said location in March of 2010.  On March 25, 2010, Big Rex, LLC ("Big Rex"), acquired the assets of Coney Beach, Inc., at the Location and executed a Franchise Agreement with RFS.  On June 28, 2010, Big Rex opened a restaurant named "Rex's Chicken" at the Location.

The italicized portions of the above interrogatory answer describe actions taken, or information obtained by B&G on behalf of BBI or RFS.

Defendants' interrogatory answers were verified by David Rutkauskas ("Rutkauskas") on behalf of BBI and RFS.  The verification signed by Rutkauskas stated that he had read the responses, that he knew the contents, and that the contents were true and correct to the best of his knowledge and belief.  However, during the deposition of David Rutkauskas, Original Rex learned that many of the other actions described in the above interrogatory answer were also

5

undertaken by B&G on behalf of BBI or RFS, and that Rutkauskas had no knowledge or information regarding the actions.

On December 8, 2010, Original Rex took the deposition of Rutkauskas, and in response to dozens of questions, Rutkauskas testified that he did not have any knowledge regarding: (1) the facts regarding defendants' contention that they have the right to use the Rex Chicken mark, (2) the investigation conducted to determine whether the Rex Chicken mark was being used by another party, (3) the factual basis for Rutkauskas verification of the trademark application filed by Rex Franchise Systems LLC, and (4) the factual basis for defendants' contention that the Rex Chicken Mark had been abandoned. Mr. Rutkauskas testified repeatedly that he relied entirely upon the advice of counsel as the basis for his position with regard to these facts, attached as Exhibit "B":

a. When Rutkauskas was asked about various communications and negotiations with Troy Beats that are discussed at length in defendants' answers to interrogatories, he stated that the only thing he knew about Troy Beats is what he had learned from Robert Sartin. *Deposition of David Rutkauskas*, at 40-41.

b. When asked whether he had knowledge of Original Rex's federal trademark registration, Rutkauskas testified, "I'd have to defer to the legal people for all that stuff." *Id.,* at 100-101.

c. When asked whether he thought Curtis Branch should be advised that the United States Patent & Trademark Office had denied the federal trademark application filed by defendant Rex Franchise Systems LLC ("RFS"), Rutkauskas testified, "Again, I'm going to have to defer to Robert in him handling this matter for me." *Id.*, at 110.

d. When asked why RFS abandoned its application to register "Rex's Chicken Since 1951", he testified, "No, I can't, I'd have to defer to my legal people on that. Robert was handling all that, not me." *Id.*, at 111.

e. When asked why RFS wanted to register "Rex's Chicken Since 1951", Mr. Rutkauskas answered, "No, I can't. I'd have to defer to Robert because he was handling all that stuff for me." *Id.*, at 112.

    f.  When asked whether he had any personal knowledge regarding the facts which he verified on behalf of RFS in its Application for Registration of the "Rex's Chicken" mark, he stated, "No. sir. I did not. I was relying on my counsel to advise me on all these issues." *Id.*, at 114.

Rutkauskas testified that he had no knowledge with regard to numerous matters that were asserted in defendants' interrogatory answers, despite his verification of those answers. Rutkauskas' testimony demonstrates that the facts set forth in defendants' interrogatory answers are known only by defendants' attorneys.

Rutkauskas testified repeatedly that he consulted with Sartin with regard to whether the "Rex's Chicken" trademark could be used, and that two days later, Sartin contacted him and gave him a "green light" to proceed, attached as Exhibit "B":

```
11      Q    What do you recall -- after you and Camille
12   first talked about introducing Rex's Chicken, what do
13   you recall being the first thing that you did to pursue
14   that idea?
15      A    I called our legal counsel, Robert Sartin.
16      Q    Okay. And I'm not going to ask you what you
17   and he discussed. Can you tell me what you did next.
18      A    Well, after he told me that, you know, we
19   could establish a mark and establish the name, then we
20   decided to establish the mark and the name and try to
21   create a recipe to the best of our ability that would
22   be close to what Rex's Chicken tasted like.
23      Q    You testified that he told you you could
24   establish a mark and establish the name?
25      A    Uh-huh.

 1      Q    How long did it take for that to happen?
 2      A    I told him to do it immediately, once I found
 3   that out.
```

*Deposition of David Rutkauskas*, at 13-14.

```
23      A    We didn't acquire any recipes. All we did
24   was I called Robert, I said, "Can we establish this
25   name and build a concept around it?" And he called me

 1   back in two days and said yes. I don't remember saying
 2   anything to anybody about owning rights, recipes. I
 3   don't -- I never said that.
 4      Q    Would it be fair to say at this point in time
 5   the reference to owning names referred to the work that
 6   your attorneys had done for you in that regard?
 7      A    I think so, yes.
```

7

```
            15      Q    I'd asked you if there was anything else
            16    other than what your attorneys were doing for you to
            17    acquire the names.
            18      A    No, it was all what they were doing.
```

*Id.* at 20-21.

```
            20      Q    Would it be fair to say that, to the extent
            21    someone was responsible for conducting a search of that
            22    nature to determine what, if any, third parties might
            23    be using the Rex mark, that that investigation was
            24    assigned to the Barrow & Grimm firm?
            25      A    Yeah, I mean, everything regarding this whole

             1    thing was -- I called Robert, I said, "Can we establish
             2    Rex's Chicken?  We want to build a restaurant."  He
             3    called me in two days, he said we could move forward,
             4    and that's what we did.
             5           The research that they did to come to that
             6    conclusion, I -- I was just completely relying on him
             7    and his advice.
             8      Q    And there was no one other than either
             9    Mr. Sartin or members of his firm that you relied on?
            10      A    I relied on him, yes.
```

*Id.* at 64-65.

```
             9      Q    I did not ask you that, sir.  I asked you,
            10    did you think it was a serious issue?
            11      A    I did not think it was a serious issue
            12    because I already cleared things with my legal people.
```

*Id.* at 72.

```
            24      A    Because when I wanted to do Rex's, I went to
            25    Robert, I said, "Can we establish this mark?  I want to

             1    build a restaurant."  He said in two days, "Yes, you
             2    can."
```

*Id.* at 97-98.

```
            12      A    No, sir.  All I did was contact Robert, asked
            13    him if I could establish this mark.  He called me in
            14    two days, told me I could, and I built a restaurant
            15    around that.  That's all I've done.
            16      Q    But it's your testimony that even if you had
            17    known that, you would have done the same thing?
            18           MR. SARTIN:  Object to the form.
            19      Q    (By Mr. Tilly)  You can go ahead and answer.
```

8

```
20        A    I'm going to have to defer to the advice of
21   my legal counsel on all those matters.
```

*Id.* at 115.

Based upon the foregoing, counsel for Original Rex wrote to counsel for defendants on December 14, 2010, attached as Exhibit "C", stating that the information contained in defendants' interrogatory answers and in Rutkauskas' deposition testimony constituted a voluntary disclosure of privileged and work product information which had placed the advice of counsel at issue, thus waiving the attorney client and work product privilege that might otherwise excuse the production of such materials during discovery.  Further, counsel for Original Rex stated that it was obvious from Rutkauskas' testimony that the privilege log previously produced by defendants was incomplete.  Counsel for Original Rex requested that defendants produce all documents and electronically stored information:

> containing or referring to communications between defendants and their counsel regarding advice given both before and after the filing of the captioned litigation relating in any way to defendants' claim that they are the owner of the Rex Chicken trademark, and in addition any documents analyzing law, facts, and/or trial strategy that reflect the attorney's mental impressions which were not given to the client.

On December 17, 2010, Original Rex issued and served two subpoenas on Robert Sartin, attached as Exhibit "D" and "E", one of which required that Sartin produce documents such as those described in the preceding paragraph, and the other of which required that Sartin appear and give deposition testimony in this matter.

On December 23, 2010, counsel for defendants replied to the 12-14-10 letter described in the previous paragraph, attached as Exhibit "F."  The reply denied that defendants have asserted "advice of counsel" as a defense or had otherwise asserted reliance on advice of counsel in an affirmative and voluntary manner.  Counsel for defendants stated that since the documents and

testimony requested in the subpoenas were privileged, neither counsel nor defendants were under any obligation to respond further to the subpoenas.

On December 30, 2010, counsel for Original Rex responded to the 12-23-10 letter described in the preceding paragraph, attached as Exhibit "G", asserting that: (1) "advice of counsel" was not considered an affirmative defense, and therefore, it was immaterial whether defendants had asserted it as a defense in their answer; (2) defendants had placed the substance of the legal advice received from Sartin "at issue" by voluntarily disclosing the substance of that advice in response to interrogatories and in deposition testimony; and (3) Rutkauskas was warned on several occasions during his deposition that he was not required to divulge communications with his counsel, but he still volunteered that information; (4) Sartin was present during Rutkauskas' deposition and asserted no objections to any of the questions asked of Rutkauskas on the grounds that the questions required Rutkauskas to disclose privileged communications; and (5) any objections to the subpoenas on the grounds that they called for the production of privileged information was waived on the grounds that Sartin had failed to produce a privilege log as required by FED. R. CIV. P. 26(b)(5)(A).

## Arguments and Authorities

### At Issue Waiver

When a party puts at issue legal advice it received, e.g., by way of an advice of counsel defense, it waives the attorney-client privilege with respect to those communications. *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1163 (9th Cir.1992). A party cannot claim that it relied on the advice of counsel, while protecting the communications from disclosure. "[S]elective waiver of the privilege may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice." *In re EchoStar*

10

*Communications Corp.,* 448 F.3d 1294, 1301 (Fed.Cir.2006). "In such a case, the party uses the attorney-client privilege as both a sword and a shield." *Id.* "To prevent such abuses, ... when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter." *Id.*

In this case, defendants have placed at issue legal advice they have received from their attorneys. Defendants contend that they have not asserted "advice of counsel" as an affirmative defense. However, "advice of counsel" is not considered an affirmative defense which must be pleaded. *Brown v. Toscano,* 630 F.Supp.2d 1342, 1349 (S.D. Fla. 2008) ("Advice of counsel" was not mandatory or genuine affirmative defense that had to be pleaded in defendant's answer to claim of patent infringement; "advice of counsel" was affirmative defense only in sense that it had to be introduced into litigation by accused infringer in mitigation of claim of willfulness); *LG. Philips LCD Co., Inc. v. Tatung Co.,* 243 F.R.D. 133, 137 (D. Del. 2007) (same).

In *Takecare Corp. v. Takecare of Oklahoma, Inc.,* 889 F.2d 955, 957 (10th Cir. 1989), the Tenth Circuit stated as follows:

> Under certain circumstances, a party's reasonable reliance on the advice of counsel may defuse otherwise willful conduct. In *Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.,* 580 F.Supp. 634, 638 (S.D.N.Y.1984), the district court held "if a client seeks counsel's advice in a timely manner, makes adequate disclosure to counsel, receives counsel's opinion and then acts upon it, surely the Chancellor must pause before branding the client as a wilful, deliberate, fraudulent commercial thief...." Absent this showing, counsel's advice alone will not "shield the actor from the consequences of his act."

Defendants have volunteered facts which, if offered into evidence, could be relied on to "defuse otherwise willful conduct." At the same time, defendants have refused to permit Original Rex to inquire regarding the actions taken, knowledge obtained, conclusions reached, and advice given by defendants counsel.

11

Defendants' partial disclosure of the role which their counsel played in their selection and use of the "Rex's Chicken" mark is prejudicial to Original Rex, because Original Rex is unable to ascertain whether these assertions are either accurate or complete.  For example, while it is asserted that defendants' counsel "did not discover Reg. No. 1633536 [the Federal Registration at issue in this litigation]", no information is provided from which Original Rex could determine whether defendants' counsel made a reasonable effort to locate that registered mark.  There is no witness that Original Rex can call who could even describe the efforts which were undertaken to determine whether any registered marks were similar to the "Rex's Chicken" mark which defendants wished to use.

The three factors applied to determine whether the proponent of the privilege has placed certain documents "at issue"; that is, whether the proponent has waived an otherwise applicable privilege through some affirmative act are:

1. Whether the assertion of the privilege is the result of some affirmative act, such as filing suit or asserting an affirmative defense, by the asserting party.
2. Whether the asserting party, through the affirmative act, put the protected information at issue by making it relevant to the case.
3. If the privilege was applied, would it deny the opposing party access to information that was vital to the opposing parties defense.

*Cardtoons, L.C. v. Major League Baseball Players Assoc.,* 199 F.R.D. 677, 681 (N.D.Okla.2001)

Rutkauskas has testified that he consulted Sartin in 2008 to inquire whether the "Rex's Chicken" mark was available, and that "two days later" Sartin contacted him and told him that the "Rex's Chicken" mark was available.  Defendants' interrogatory answers state that Sartin (or others in his firm) did not discover the REX Mark.  Defendants are clearly taking the position that they did not know of the REX Mark when they embarked upon their course of infringing conduct, and their only evidentiary support for their lack of knowledge is the legal advice that they allegedly sought and received from Sartin.  Since the REX Mark can be found from a

simple search of the Trademark Electronic Search System (TESS) maintained online by the U.S. Patent and Trademark Office, it is indeed difficult to understand how an attorney conducting a reasonable search of the TESS database would not discover the REX Mark.

### Waiver by Voluntary Disclosure

Disclosure of privileged attorney communications to a third party also constitutes waiver of the attorney-client privilege. *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir.1992). The disclosure of such communications "constitutes waiver only as to those communications about the matter actually disclosed." *Id.*

Defendants argue that the information provided in their interrogatory answers, and the testimony given by Rutkauskas does not constitute a voluntary waiver because it was "elicited" by counsel for Original Rex. However, defense counsel drafted the interrogatory answers, and Mr. Sartin was present during Rutkauskas' deposition and did not assert any objections to the questions asked. Rutkauskas was warned several times that he was not required to divulge communications between him and his attorney, and ignored these warnings.

In *U.S. v. Bernard*, 877 F.2d 1463 (10th Cir. 1989), a criminal defendant sought a reversal of his conviction on the grounds that the District Court improperly allowed the defendant's former counsel to testify regarding conversations he had with the defendant during the course of representation. A government witness testified regarding a conversation with the defendant in which the defendant stated that he had discussed a particular transaction with his attorney, and that the attorney confirmed that the transaction was lawful. The defendant did not object to this testimony. Later during the trial, the Court held that the defendant had waived the attorney client privilege by disclosing the content of his attorney's advice to a third party, and permitted the government to call the defendants' former attorney, who testified that he had never

13

discussed the transaction with the defendant. Addressing the defendant's assertion that the District Court committed error by allowing this testimony, the Tenth Circuit stated:

> Mr. Bernard willingly sacrificed his attorney-client confidentiality and privilege by voluntarily disclosing the confidential communication to Mr. Treat. Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege. Mr. Bernard did this in an effort to convince Mr. Treat that the proposed nominee loan was lawful and proper. Mr. Bernard, having revealed the purported conversation between himself and his counsel in an effort to induce Mr. Treat to engage in a nominee loan, cannot later claim the protection of the attorney-client privilege. Courts need not allow the claim of attorney-client privilege when the party claiming the privilege is attempting to utilize the privilege in a manner that is not consistent with the privilege.

*Id.* at 1465. Similarly, Rutkauskas willingly sacrificed his attorney-client confidentiality and privilege by voluntarily disclosing the confidential communication to Mr. Sartin. Once waived, the privilege is gone forever, and cannot be reclaimed at the convenience of the client.

### Scope of the Waiver

Under these circumstances, defendants have placed their advice of counsel at issue, and have waived the privilege. Once it is determined that a waiver has occurred, the Court must determine how broad the waiver is, and what information must be provided. In *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P.,* 210 F.R.D. 673, 678-79 (D.Minn. Aug 09, 2002), the Court was required to determine the scope of defendants' waiver. Defendants contended that they were only required to produce the opinion letter received from their counsel. The Court, however, rejected this contention, and held that defendants were required to produce "all communications, which do not concern litigation strategy, but which are "involved in setting forth a communication expressly indicating an opinion or conclusion on the" issue of whether the Defendants could legally use the MINNESOTA WILD Mark, given the Plaintiff's use of that mark."

14

In *Adidas America, Inc. v. Payless Shoesource, Inc.*, 546 F.Supp.2d 1029 D. Or. 2007), the Court went even further, holding that Payless had waived "the attorney-client privilege and work product protection as to both pre-suit and post-suit matters relating to the advice Payless received from counsel on non-infringement of any of its shoes." The Court further held that Payless "waived work-product protection regardless of whether Defendant's counsel actually communicated or disclosed the work product to Payless."

### Summary

Defendants' state of mind in regard to their adoption and use of the Rex's Chicken mark is an issue that will have an impact on several issues in this lawsuit. Defendants' have taken the position that their state of mind was premised entirely on the advice they received from their legal counsel, and have disclosed some of the legal advice which they received. In doing so, defendants have placed their attorneys' advice at issue, and such disclosure constitutes a waiver of the privilege. For the reasons set forth above, Original Rex respectfully requests that *Defendants' Combined Motion to Quash Subpoena Duces Tecum and Deposition Subpoena* be denied, and that the Court enter such orders as may be appropriate to enforce said subpoenas.

**THE TILLY LAW FIRM**

By:/s/James W. Tilly_____
James W. Tilly
THE TILLY LAW FIRM
1639 South Carson Avenue
Tulsa, Oklahoma 74119-4215
Telephone (918) 583-8868
Facsimile (918) 584-3162
jwtilly@tilly.com

**Attorney for Plaintiff**

**CERTIFICATE OF SERVICE**

  I hereby certify that on March 2, 2011, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

  Robert B. Sartin
  Adam K. Marshall

I hereby certify that on March2, 2011, I served the same document by U.S. Postal Service on the following, who are not registered participants of the ECF system:

  No manual recipients

  /s/ James W. Tilly _____
  James W. Tilly
  THE TILLY LAW FIRM
  1639 S. Carson Ave.
  Tulsa, Oklahoma 74119
  Telephone: (918) 583-8868
  Facsimile:   (918) 584-3162
  jwtilly@tilly.com