## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ORIGINAL REX, L.L.C., an Oklahoma<br>limited liability company, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-424-GKF-FHM |
| | ) | |
| BEAUTIFUL BRANDS | ) | |
| INTERNATIONAL, LLC, REX'S | ) | |
| FRANCHISE SYSTEM, LLC, BERRY | ) | |
| CHIC-A-LO, LLC, BIG | ) | |
| REX, LLC, and CONEY BEACH, INC., | ) | |
| | )) | |
| Defendants. | | |

### OPINION AND ORDER

Before the court are the Motion for Partial Summary Judgment of defendants Beautiful

Brands International, LLC, Rex's Franchise Systems, LLC, Berry Chic-A-Lo, LLC, Big Rex, LLC

and Coney Beach, Inc. [Doc. # 84] and the Motion for Partial Summary Judgment of plaintiff

Original Rex, L.L.C. [Doc. #85].

### I.  Background/Procedural Status

This is an action for trademark infringement for defendants' alleged illegal use of the

trademark "Rex's Chicken," Federal Trademark Registration No. 1,633,536 (the "Mark").  Plaintiff

Original Rex, L.L.C. ("Original Rex"), asserts six claims for relief:

> Count I–Federal trademark infringement [15 U.S.C. § 1114(1)-(2)];

> Count II–Federal trademark infringement and unfair competition [15 U.S.C. § 1125(a)];

> Count III–False advertising [15 U.S.C. § 1125(a)];

> Count IV–Federal trademark dilution [15 U.S.C. § 1125(c)];

> Count V–Violation of the Oklahoma Deceptive Trade Practices Act [78 O.S. § 53];

Count VI–State common law unfair competition.

Amended Complaint [Doc. #42]. Plaintiff seeks injunctive relief and damages. Defendant Rex's Franchise Systems, LLC ("RFS") has filed a counterclaim alleging the Mark was abandoned and seeking cancellation of its registration. [Doc. #11].

Defendants and plaintiff filed motions for partial summary judgment. Defendants' motion [#84] seeks summary judgment on three issues:

(1) that plaintiff's claims for violations of the Lanham Act fail because the Mark was abandoned in 2002;

(2) that plaintiff lacks standing to bring a claim for false advertising under 15 U.S.C. § 1125(a);

(3) that plaintiff lacks standing to bring a claim for violation of the Oklahoma Deceptive Trade Practices Act ("ODTPA"), 78 O.S. § 53.

Plaintiff's motion [#85] seeks summary judgment on five issues:

(1) that it is the owner of the Mark;

(2) that defendants have infringed the Mark;

(3) that defendants' goods and services are not licensed, authorized, franchised, sponsored, endorsed or approved by plaintiff and are similar to and compete with goods and services sold or licensed by plaintiff and are sold through the same channels of trade;

(4) that defendants' products and services featuring the Mark are likely to deceive, confuse and mislead prospective purchasers, purchasers and other relevant members of the public into believing that the products or services were produced, authorized or are in

2

some manner associated with plaintiff and its predecessors, causing

irreparable harm to plaintiff; and

(5) that the Mark was not abandoned by plaintiff's predecessors.

## II.  Material Facts

In 1974, Vernon McFarland, in cooperation with Louis Rex Curtis, first introduced a

boneless, skinless, bite size chicken breast meat marinated in a spicy liquid.  By 1975, the product

was sold through independent restaurants.  In 1975, McFarland acquired the exclusive rights to the

Rex process and name for the states of Oklahoma, Missouri, Arkansas and Texas, and in 1981,

these rights were expanded to include Kansas, Colorado, Louisiana and New Mexico. [Doc. #87,

Plaintiff's Statement of Fact ¶3; Doc. #100, Defendants' Response to Plaintiff's Statement of Fact

¶3].

In 1976, McFarland formed McFarland Distributors, Inc., an Oklahoma corporation

("MDI"). The same year, MDI opened the first Rex Restaurant in McAlester, Oklahoma.  The Rex

Restaurant concept focused on the boneless, bite size chicken and, over the next several years, was

expanded by MDI to include unique side dishes and items such as the "Rex Fry Bread." [Doc. #87,

Plaintiff's Statement of Fact ¶4; #100, Defendants' Response to Plaintiff's Statement of Fact ¶4].

Rex Chicken Company, an Oklahoma corporation, was incorporated on February 10, 1977

with the Oklahoma Secretary of State. [Doc. #113, Defendant's Reply, Ex. B].  Vernon McFarland

was president of Rex Chicken Company, which produced and sold chicken to purported licensees.

[Doc. #84, Defendants' Statement of Fact ¶2 and Ex. 1, Depo. of Jerry Dodson, p. 28, l. 19- p. 29, l.

5.]

Beginning in the mid-1970's, MDI entered into various franchise and license agreements

3

with independent restaurant operators utilizing certain aspects of the Rex Restaurant system.  Some

of these restaurants identified their restaurants under the "REX" name; others operated under a

different name but displayed the "REX" name; and others did not identify the chicken products

under the "REX" name at all. [Doc. #87, Plaintiff's Statement of Fact ¶9; Doc. #100, Defendants'

Response to Plaintiff's Statement of Fact ¶9].

On May 4, 1977, Rex Chicken Company, as Licensor, entered into a Franchise Agreement

("Franchise Agreement") with John B. Ballard ("Ballard"), owner and operator of Ballard's Drive-

In in Paul's Valley, Oklahoma ("Ballard's Drive-In"). [Doc. #84, Defendants' Statement of Fact ¶4

and Ex. 2, Franchise Agreement dated May 4, 1977; Doc. #106, Plaintiff's Response to Defendants'

Statement of Fact ¶4].  The Franchise Agreement gave Ballard the right to use the name "Rex

Chicken" in connection with the retail sale of "boneless food products" at Ballard's Drive-In. [Doc.

#84, Ex. 2, Franchise Agreement §1].

The Franchise Agreement required Ballard to purchase products and supplies from Rex

Chicken Company, or from a source approved by Rex Chicken Company, and to pay Rex Chicken

Company a royalty of 15 cents per pound of chicken or turkey sold (the "Royalty"). [*Id.,* Franchise

Agreement, §5].  It provided for automatic renewal of subsequent five-year periods, unless notice

in writing was given by one of the parties of an intention to terminate. [*Id.,* §11].  The Franchise

Agreement allowed the Licensor to assign the Franchise Agreement to a transferee licensor. [*Id.,*

§10].  However, it provided, "[s]uch assignment shall not be binding upon the Licensee until the

transferee has agreed in writing to assume all of the Licensor's obligations to the Licensee under

the terms of [the Franchise Agreement]." [*Id.,* §10].  Further, to be effective, "the Licensee [must

have] received a statement in writing signed by both the Licensor and its transferee of the

4

assumption of such obligations." [*Id.*].  The franchise agreement itself gave the Licensor the right to determine standards of quality, service, production, merchandising, advertising and prices of all "Rex" products sold by the Licensee, required the Licensee to maintain the interior and exterior of the building and keep it clean, and to use his best efforts to maintain and increase sales of products. [See Doc. #84, Ex. 2, Franchise Agreement, ¶6].

Beginning in 1977 when Ballard became a licensee of MDI, Vernon McFarland visited Ballard's Drive-In to deliver chicken approximately every other week until his death in 1988, and never complained about the restaurant. [Doc. #87, Plaintiff's Statement of Fact ¶19 and Ballard Depo., pp. 59-60].

Vernon McFarland served as president of MDI until his death.  Following his death, his widow, Dollie McFarland, became President, CEO and Chairman of the Board of Directors of MDI. [Doc. #87, Plaintiff's Statement of Fact ¶10; Doc. #100, Defendants' Response to Plaintiff's Statement of Fact ¶10].

On March 9, 1979, Rex Chicken Company was suspended by the Oklahoma Tax Commission, and no further activity appears of record for Rex Chicken Company with the Oklahoma Secretary of State. [Doc. #113, Ex. B].

No evidence of a written assignment of Rex Chicken Company's rights in the Franchise Agreement to MDI has been produced in this case, and Ballard never received written notice of an assignment of Rex Chicken Company's rights in the Franchise Agreement. [Doc. #84, Defendants' Statement of Fact ¶9 and Ex. 3, Depo. of Steven Price, p. 55, ll. 2-16 and Ex. 4, Depo. of John

Ballard, p. 37, l.1-p. 38, l. 15].[1]

On December 18, 1989, MDI filed its application with the U.S. Patent and Trademark Office ("USPTO") for registration of the Mark.  The Mark was applied for under International Class: 042 for use in connection with "Restaurant and Catering Services."  Pursuant to said application, MDI claimed first usage of the Mark on "1989-08-00." [#113, Reply, Ex. C].

Ballard began using the Mark in connection with the sale of boneless chicken at Ballard's Drive-In in 1989, and he continues to use the Mark to the present date.  Ballard's use of the Mark is limited to use at the Ballard's Drive-In location and in the surrounding community. [Doc. #84, Defendants' Statement of Fact ¶11 and Ex. 2, Franchise Agreement §1; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶11].

No evidence has been submitted that Ballard and/or Ballard's Drive-In have ever been under the common ownership or control of any registered owner of the Mark or any of the registered owners' directors, officers, employees, shareholders or limited liability company members. [Doc. #84, Defendants' Statement of Fact ¶12].

On January 29, 1991, the Mark was registered with the USPTO, Registration No. 1,633,536. [Doc. No. #84, Defendants' Statement of Fact ¶13; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶13].  MDI also registered the mark, "REX THE ORIGINAL" and Design, Reg. No. 1,639,311, issued March 26, 1991.  [Doc. #87, Plaintiff's Statement of Fact ¶7 and Ex. I; Doc. #100, Defendant's Response to Plaintiff's Statement of Fact ¶7].

---

[1]Although plaintiff admits this, it alleges that Rex Chicken Company, MDI and Ballard all believe an assignment had taken place and the franchise agreement remained in effect. [#106, Plaintiff's Response to Defendants' Statement of Fact ¶9 and Ex. C, Depo. of Price at 55 and Ex. D. Depo. of Ballard at 50, ll. 21-23 and 58, ll. 15-20].

Jerry Dodson, Vice President of Franchise Development for MDI, sent a letter to Ballard dated March 3, 1992, which notified Ballard his franchise contract was the last such contract in existence and was set to expire May 4, 1992.  The letter stated:

> At Dollie's [McFarland] request, we are extending your agreement another year as proposed in the attached Modification Agreement.  Dollie recognizes your long relationship with and loyalty to the Rex concept.  As she discussed with you, the right to sell the Rex product is yours personally and cannot be sold to anyone else.
>
> Please review and sign two copies of the enclosed Modification Agreement and return both to me in the enclosed envelope.  We will then return to you one fully executed copy.

[Doc. #84, Defendants' Statement of Fact ¶14 and Ex. 5, Letter from Dodson to Ballard; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶14].  No executed Modification Agreement has been produced to date. [*Id.*].

Dodson testified MDI's intent, upon the express direction of Dollie McFarland, was to terminate Ballard's Franchise Agreement and license, as part of the systematic termination of all franchisees or licensees in existence prior to the March 3, 1992 letter. Dodson testified that if any pre-existing users of the mark were still doing business affiliated with the Rex trade name, they were doing so against the wishes of MDI and Dollie McFarland. [Doc. #84, Defendant's Statement of Fact ¶15 and Ex.  1, Dodson Depo., p. 79, l. 25-80, l. 6].[2]

On December 28, 1993, MDI sold all of its assets, including the franchising system and the Mark, to Rex Chicken, LLC, an Oklahoma limited liability company ("Rex Chicken, LLC").  An assignment of the Mark in favor of Rex Chicken, LLC, was recorded with the USPTO effective on

---

[2]Dollie McFarland contradicts this statement. [Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶15 and Ex. B, Decl. of  Dollie McFarland, ¶9 and Ex. E., Depo. of Dollie McFarland, pp. 48-49].

December 28, 1993. [Doc. #84, Defendants' Statement of Fact ¶16; Doc. #106, Plaintiff's Response

to Defendants' Statement of Fact ¶16.].  Rex Chicken, LLC, was a wholly owned subsidiary of

Magnum Foods, a corporation which was a licensee of Little Caesars Pizza.  No written notice of an

assignment of the Franchise Agreement to Rex Chicken, LLC, has been produced and no written

notice was given to Ballard. [Doc. #84, Defendants' Statement of Fact, ¶17 and Ex. 3, Depo. of

Price, p. 55, ll. 2-16 and Ex. 4, Depo. of Ballard, p. 37, l. 1-p. 38, l. 15].

        Ballard has continuously operated his restaurant in Pauls Valley and offered Rex chicken to

the public since he became a licensee of MDI in 1977, and, since 1989, he has used the Mark in the

advertising for his restaurant. [#87, Plaintiff's Statement of Material Facts, ¶15 and Ex. Q, Ballard

Affidavit].

        Ballard testified that starting at some point before MDI sold its assets to Rex Chicken, LLC,

in 1993, Dollie McFarland stopped requiring him to pay royalties for the right to use the Mark and

sell Rex Chicken. [Doc. #84, Ex. 4, Ballard Depo., p. 49, ll. 6-17].   He also testified he stopped

receiving spice packs for Rex Chicken and had been producing his own spice packets for three to

four years and obtaining chicken product on his own for more than five to seven years and perhaps

longer than 10 years.  [*Id.,* Ex. 4, Ballard Depo., p. 18, l. 5-p. 20, l. 15].

        Troy Beats, a former President of Rex Chicken, LLC, testified that he could not define

Ballard's relationship as a franchisee or licensee because "they sell a whole different menu that was

not what I would consider Rex Chicken.  Just the product was what they were selling." [Doc. #84,

Defendants' Statement of Fact ¶19 and Ex. 7, Depo. of Troy Beats, p. 14, l. 25-p. 15, l. 17].   Beats

also testified that he never had any conversations with anyone at Ballard's and  Rex Chicken, LLC,

did not conduct operational assessments of Ballard's because it was not considered to be a franchise

8

restaurant. [*Id.,* Beats Depo. at p. 15, ll. 4-17].

Dollie McFarland claims that after MDI sold its assets to Rex Chicken, LLC, she became a 10% owner of Rex Chicken LLC until 2000, when Rex Chicken, LLC's assets were transferred to Magnum. [Doc. #87, Plaintiff's Statement of Fact ¶11 and Dollie McFarland Depo., pp. 32-37]. She also claims to have acted as a consultant to Rex Chicken, LLC, until 1998. [*Id.*].  Additionally, she became a franchisee of the Rex brand and operated several Rex Chicken restaurants in the Tulsa area. [Doc. #84, Defendants' Statement of Fact ¶20 and Ex. 8, Dollie McFarland Depo., p. 16, l. 14-p. 17, l. 13].  She sold all of her interest in her restaurants to Troy Beats, a Rex Chicken, LLC, employee, in 2000. [*Id.,* Ex. 8, McFarland Depo., p. 16, l. 14-p. 17, l. 13].  At that time, she ceased paying any royalties or conducting any business associated with Rex Chicken and the Mark. [*Id.*].  In other words, as of 2000, Dollie McFarland had no further relationship with either Rex Chicken or the Mark. [*Id.*; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶20].

Troy Beats closed all of his Rex Chicken restaurants and ceased paying any royalties by 2002.  From and after 2002, Troy Beats had no further relationship with Rex Chicken or the Mark. [Doc. #84, Defendants' Statement of Fact ¶21; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶21].

By its own admission, Rex Chicken, LLC, "ceased to operate the Rex Chicken franchise" on November 4, 2000, and claims to have "transferred all its rights related to that system, including the trademarks, to Magnum Foods, Inc.," an Oklahoma corporation ("Magnum").  No documents were drafted to evidence this transaction.  No assignment of the Mark to Magnum was registered with the USPTO.  No written notice of an assignment of the Franchise Agreement to Magnum has been produced in connection with this transfer, and no written notice was given to Ballard. [#84,

Defendants' Statement of Fact, ¶22; #106, Plaintiff's Response to Defendant's Statement of Fact, ¶22].

Steven L. Price is Magnum's President and CEO.  Teresa Coffman is Magnum's Controller and maintained the Rex Chicken, LLC mark filings with the USPTO. [Doc. #84, Defendants' Statement of Fact ¶23; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶23]. Price testified he had never seen the Franchise Agreement.  He testified he has been to Ballard's Drive-In and met with Ballard on one occasion in the late 1990s (or possibly 2000), but he could not remember its location and has not conducted any oversight or inspection of Ballard's Drive-In since sometime in 2000. [Doc. #84, Defendants' Statement of Fact ¶24 and Ex. 3, Price Depo. at p. 20, ll. 13-21; p. 60, l. 3-p. 61, l. 3 and p. 63, ll. 17-19].[3]  Coffman testified that since Magnum's last store closed in 2002, she has done nothing to keep track of Ballard, his restaurant is not in its system and she is not aware of any operations he has at this point. [Doc. #84, Defendants' Statement of Fact ¶24 and Ex. 9, Depo. Of Coffman, p. 24, l. 25-p. 25, l. 8; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶24].

Ballard testified he has never heard of Magnum and never met Price or Troy Beats.  He also testified he did not know of any entity other than those owned by the McFarland family that ever owned the Mark or the related franchise system. [#84, Defendants' Statement of Fact, ¶26 and Ex. 4, Ballard Depo., p. 17, ll. 22-25, p. 33, ll. 1-7; p. 47, ll. 20-24].

Magnum, does not now have, nor has it ever had, any common ownership and/or control

---

[3]However, he also testified he visited the restaurant again "less than six or seven years ago." [Doc. #87, Plaintiff's Statement of Fact ¶23 and Doc. #90, Ex. 17, Price Depo., pp. 22-23]. He did not see Ballard then, it was "strictly a cordial visit, ordered some product, eat the product, went on." [*Id.,* Price Depo., pp. 22].

with Rex Chicken Company, MDI, and/or the McFarland family, including without limitation, Vernon McFarland, Dollie McFarland, Terri L. McAuliff, Joe Johnson or plaintiff. [Doc. #84, Defendants' Statement of Fact ¶27 and Ex. 3, Price Depo., p. 6, l. 20-p. 7, l. 2].

Despite having "ceased to operate the Rex Chicken franchise and [having] transferred all its right [*sic*] related to that system" to another company on November 4, 2000, on January 25, 2001, Rex Chicken, LLC, by and through its purported President, Price, declared under oath to the USPTO that as of said date it was "using the [M]ark in Commerce on or in connection with the goods/services identified" as set forth in the Combined Declaration of Use in commerce/Application for Renewal of Registration of Mark Under Sections 8 & 9 (15 U.S.C. §§ 1058 & 1059) (the "Renewal Declaration"). [Doc. #84, Defendants' Statement of Fact §28 and Ex. 10, Renewal Declaration].  The Renewal Declaration relied on a specimen containing the "Rex 'the Original' mark, which is nearly identical to the Mark except it has the words "the Original" in underlined script below the "REX" symbol. [see Doc. #84, Defendants' Statement of Fact ¶28].  On May 15, 2001, based upon the statements by Price in the Renewal Declaration, the USPTO accepted Rex Chicken, LLC's Section 8, 10-year renewal of the Mark registration.  [Doc. #84, Defendants' Statement of Fact ¶30; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶30].

Magnum allowed the Rex "the Original" Mark to be cancelled by the USPTO on April 6, 2002. [Doc. #84, Defendants' Statement of Fact ¶29 and Ex. 11, Trademark Applications & Registrations Retrieval latest status information for Rex "the Original" Mark dated February 28, 2011; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶29].

Price testified he closed the last restaurants franchised or operated by Magnum due to

11

inefficient operation and loss of money, "so the thought process that time was to potentially cobrand it with potentially Little Caesars in  a dual location under one roof which would make the concept more feasible." [Doc. #90, Ex. 17, Depo. of Price, p. 29, ll. 6-11].  At the time, Price  had discussions with Little Caesars Enterprises. [*Id.,* Price Depo., p. 29, ll. 12-24].  However, nothing ever came of those discussions and no cobranding occurred. [*Id.*]

Both Coffman and Price testified Magnum intended to and did discontinue the use of the Mark indefinitely in 2002 because all of its restaurants had closed[4] and because it had previously developed a new, replacement trademark and logo, Registration No. 2321447 (the "Ribbon Mark").[5]   [#84, Defendants' Statement of Fact ¶¶31-32 (see ¶32 for depiction of Ribbon Mark)]. Troy Beats also testified that the Mark was abandoned in favor of the Ribbon Mark.  [Doc. #84, Defendants' Statement of Fact ¶33 and Ex. 7, Beats Depo., p. 13, ll. 5-10].  The parties disagree about whether the Ribbon Mark resembles the Mark. [Doc. #106, Defendants' Statement of Fact ¶32].  However, it is undisputed that the Ribbon Mark was cancelled November 25, 2006. [Doc. #84, Ex. 12, Trademark Application and Registrations Retrieval latest status information for "Ribbon Mark" dated December 5, 2010].

On November 7, 2002, Rex Chicken, LLC's entity status was terminated by the Oklahoma Secretary of State and Rex Chicken, LLC, filed its final tax return in 2002. [Doc. #84, Defendants'

---

[4]Plaintiff, citing the Price deposition, alleges all Rex Chicken Restaurants that were franchised or operated by Magnum were closed by approximately 2003-2004, because one in Oklahoma City remained open until then. [#87, Plaintiff's Statement of Fact ¶12 and Doc. #90, Ex. 17, , Price Depo. at p. 27].

[5]The Ribbon Mark received its USPTO registration on February 22, 2000. [Doc. #84, Ex. 12, Trademark Application and Registrations Retrieval latest status information for "Ribbon Mark" dated December 5, 2010].

Statement of Fact ¶34 and Ex. 13, Oklahoma Secretary of State Filing History for Rex Chicken, LLC and Ex. 9, Coffman Depo., p. 13, ll. 17-21].  On July 1, 2005, Rex Chicken, LLC's entity status was cancelled by the Oklahoma Secretary of State and has never been revived or reinstated. [Doc. #84, Defendants' Statement of Fact ¶36 and Ex. 13; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶36].

Since 2002, Ballard has not purchased any products and/or supplies from Rex Chicken Company and/or its successors in interest, including without limitation Rex Chicken, LLC, Magnum or a supplier approved by Rex Chicken, LLC, or Magnum. [Doc. #84, Defendants' Statement of Fact ¶35; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶35].

On March 1, 2010, more than nine years after Rex Chicken, LLC, declared it ceased to operate the "Rex Chicken" franchise system, and more than seven years after Rex Chicken, LLC, was terminated by the Oklahoma Secretary of State, Rex Chicken, LLC, executed a purported Assignment of the Mark (the "First Assignment") in favor of Dollie McFarland's children, Terri L. McAuliff and Joe R. Johnson (collectively "McAuliff and Johnson").  The First Assignment was executed by Price, purporting to be the President of the terminated and cancelled entity Rex Chicken, LLC. [Doc. #84, Defendants' Statement of Fact ¶37 and Ex. 14, Assignment of Registered Trademark and/or Service Mark dated March 1, 2010; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶37].

On April 1, 2010, a second assignment from Rex Chicken, LLC, and Magnum (the "Second Assignment") was signed by Price in favor of McAuliff and Johnson, purporting to assign the Mark and all associated intellectual property. [Doc. #84, Defendants' Statement of Fact ¶38 and Ex. 6, Assignment of Trademarks and Other Rights dated April 1, 2010; #106, Plaintiff's Response to

13

Defendants' Statement of Fact ¶38].

At some point subsequent to the Second Assignment Terri McAuliff prepared an undated typed statement ("Clarification Statement") purporting to be on behalf of Magnum and Price, stating that Magnum did not intend to abandon the Mark.  McAuliff produced the Clarification Statement to Price via facsimile and Price signed it. [Doc. #84, Defendants' Statement of Fact ¶39 and Ex. 15, Clarification Statement, and Ex. 3, Price Depo., p. 52, l. 3-p. 54, l.4; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶39].

On April 2, 2010, plaintiff, Original Rex, LLC, was formed with the Oklahoma Secretary of State.  McAuliff and Johnson are the members of Original Rex, LLC.  Joe Johnson testified that, other than acting as plaintiff in this lawsuit, plaintiff conducts no other business.  He further testified that plaintiff has a website with no content except the words, "Coming Soon," and the image of the cancelled Rex "the Original" Mark.  When asked about potential franchisees or other business prospects, Johnson testified he had spoken with one indivudal.  Terri McAuliff testified that neither she nor plaintiff acquired any greater rights in the Mark and Rex brand than Magnum had on the date of the First Assignment and Second Assignment. [Doc. #84, Defendants' Statement of Fact ¶40 and Ex. 16, Depo. Of Joe Johnson, p. 12, l. 12-p. 15, l. 22; p. 17, l. 18-p. 18, l. 4; Ex. 17, Website Capture of http://rexbonelesschicken.com/; and Ex. 18, McAuliff Depo., p. 17, ll. 11-17].

On April 2, 2010, an assignment of the Mark by Rex Chicken, LLC (which had been previously terminated and canceled) to Joe Johnson and Terri McAuliff  was recorded with the USPTO and on April 9, 2010, McAuliff and Johnson recorded an assignment of the Mark in favor of plaintiff with the UPSTO. [Doc. #84, Defendants' Statement of Fact ¶41 and Ex. 19, USPTO Trademark Assignment Abstract of Title; Doc. #106, Plaintiff's Response to Defendants' Statement

of Fact ¶41].

On April 9, 2010, Ballard signed an Affidavit and Assignment ("Ballard's Affidavit")

referencing his status as a franchisee and licensee pursuant to the 1977 Franchise Agreement and

purporting to grant Dollie McFarland, Terri McAuliff and Joe Johnson all rights he may have in the

"Rex" marks, subject to his continuing right to use the marks.  Ballard testified that the Assignment

was produced and presented to him by McFarland, McAuliff and Johnson. [Doc. #84, Defendants'

Statement of Fact ¶42 and Ex. 20, Affidavit and Assignment dated April 9, 2010 and Ex. 4, Ballard

Depo., p. 50, ll. 9-10; Doc. #106, Plaintiff's Response to Defendants' Statement of Fact ¶42].

Ballard's Drive-In is located near I-35 in Pauls Valley and has operated continuously since

1951.  Ballard advertises on billboards visible to both north and south bound travelers on I-35, and

also advertises in the Yellow Pages, in the local newspaper and on radio. [Doc. #87, Plaintiff's

Statement of Fact ¶¶16-17].  Plaintiff asserts Ballard's Drive-In has achieved a level of popularity

that extends far beyond Pauls Valley due in part to its location near I-35, its longevity, the fact that

Ballard, 88, still hops cars and in "large part," the fact that it serves Rex Chicken. [Doc. #87,

Plaintiff's Statement of Fact ¶18 and Ex. T, Comments 1-205].

After Vernon McFarland's death, Dollie McFarland and other members of the McFarland

family would visit Ballard's Drive-In once every two or three years. [Doc. #87, Plaintiff's

Statement of Fact ¶21 and Ballard Depo., pp. 23-24, 60].  During these visits, the only comments

that were made about the restaurant were compliments. [*Id.*].  Dollie McFarland testified that while

these visits were partly social, she continued to own an interest in Rex Chicken, LLC, until

approximately 2000 and was still very interested in Rex's product. [Doc. #87, Plaintiff's Statement

of Fact ¶21 and Dollie McFarland Depo, pp. 43-45].

15

In 2008, defendant Coney Beach, Inc. ("CBI") began to sell bite size boneless chicken which was described by the name "Rex's Chicken."  Plaintiff contends Beautiful Brands, Inc. ("BBI") and CBI were, at that time, aware of the history and goodwill associated with the Mark and represented to the public that they were the owner of the names, rights and recipes associated with the Mark.  They cite to articles from the Tulsa World and Tulsa Beacon. [Doc. #87, Plaintiff's Statement of Fact ¶26 and Exs. V, W].

On or about October 29, 2008, defendant RFS filed an application with the USPTO seeking registration of the "REX'S CHICKEN" Mark. [Doc. #87, Plaintiff's Statement of Fact ¶27 and Ex. X at 24; Doc. #100, Defendant's Response to Plaintiff's Statement of Fact ¶27].  On or about April 12, 2010, the USPTO refused to register the REX'S CHICKEN Mark based on a likelihood of confusion between it and the REX Mark. [Doc. #87, Plaintiff's Statement of Fact ¶28 and Ex. X at 3; Doc. #100, Defendants' Response to Plaintiff's Statement of Fact ¶28].

On June 28, 2010, the Coney Beach restaurant at 11089 S. Memorial Drive was reopened under the name "Rex's Chicken," and is operated and owned by defendant Big Rex, LLC, pursuant to an agreement with RFS.   [Doc. #87, Plaintiff's Statement of Fact, ¶30; Doc. #100, Defendants' Response to Plaintiff's Statement of Fact ¶30].

Citing reviews of the chicken served at "Rex's Chicken," plaintiff asserts consumer opinion about the quality of the goods and services being offered under the Rex's Mark has been mixed at best. [Doc. #87, Plaintiff's Statement of Fact, ¶31].

To promote its efforts to offer the sale of franchise agreements to third parties for the operation of restaurants using the REX Marks, RFS has registered the internet domain name www.rexschicken.com, and operates a web site for the purpose of soliciting such franchise

16

agreements. [Doc. #87, Plaintiff's Statement of Fact ¶32 and Ex. FF; Doc. #100, Defendants' Response to Plaintiff's Statement of Fact ¶32].

As a prominent part of defendants' marketing and advertising efforts, defendants use the phrase "Since 1951."  However, defendants have not been in the business since 1951, but rather first began to offer boneless bite-size chicken to the public in 2008.  The following statement appears on defendants' website:

> **The BIG attraction since 1951.**  From the day we opened at an Oklahoma gas station, diners flocked to Rex's Chicken.  Word spread until travellers across the USA were mapping a route that brought them to Rex for crispy bite-size chicken, fabulous frybread and honey sides.

[Doc. #87, Plaintiff's Statement of Fact ¶33; Doc. #100, Defendants' Response to Plaintiff's Statement of Fact ¶33].

## III.  Analysis

### A.  Abandonment of Mark

In order to establish a violation of federal or state trademark law or unfair competition, a plaintiff must be able to establish a protectable interest in a valid mark.  *Donchez v. Coors Brewing Co.,* 392 F.3d 1211, 1215, 1219 (10th Cir. 2004).  Defendants, in their motion for partial summary judgment, claim the plaintiff has no rights in the Mark because the Mark has long been abandoned.  They also contend plaintiff lacks standing to bring either a false Lanham Act false advertising claim or a state deceptive trade practices claim.  Plaintiff, in its motion for partial summary judgment, argues it is entitled to summary judgment on its claim for federal trademark infringement.  The primary focus of both motions is the issue of whether the trademark at issue was abandoned.

The Lanham Act, 15 U.S.C. § 1127, states that a mark shall be deemed to be "abandoned":

(1) When its use has been discontinued with intent not to resume such use.  Intent not to resume may be inferred from circumstances.  Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.  "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127.

The party asserting abandonment has the burden of proving that the owner of the mark both (1) discontinued the use of the mark and (2) intended not to resume its use. *Vais Arms, Inc. v. Vais,* 383 F.3d 287, 293 (5th Cir. 2004).  And because abandonment is "in the nature of a forfeiture," courts have consistently held that the party asserting abandonment is required to "strictly prove" its claim. *Collectable Promotional Products, Inc. v. Disney Enterprises, Inc.,* 2009 WL 1543449, at *9 (W.D. Okla., June 2, 2009).[6]  Non-use for three consecutive years alone, however, constitutes prima facie evidence of abandonment. *Emergency One, Inc. v. American FireEagle, Ltd.,* 228 F.3d 531, 536 (4th Cir. 2000); 115 U.S.C. § 1127(1).  Thus, proof of three consecutive years of non-use creates a presumption of abandonment. *Id.*  "Once the presumption is triggered, the legal owner of the mark has the burden of producing evidence of either actual use during the relevant period or intent to resume use." *Id.*  Additionally, in *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.,* 769 F.2d 1393, 1396 (9th Cir. 1985), the court held the presumption can be rebutted by showing "valid reasons for nonuse."

---

[6]Courts are not in agreement as to what is meant by "strict proof."  Some have held that a defendant must prove abandonment by clear and convincing evidence. *See Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F. Supp.2d 247, 268 (S.D.N.Y. 2002).  Others have declined to expressly adopt that standard, although describing the defendant's burden as one of strict proof. *See, e.g., Cumulus Media, Inc. v. Clear Channel Communications, Inc.,* 304 F.3d 1167, 1175 (11th Cir. 2002).  It does not appear the Tenth Circuit has decided this question.

"[T]he owner of a trademark cannot defeat an abandonment claim ... by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date." *Id.* at 537 (4th Cir. 2000). "Once the challenger shows discontinued use, the owner must produce evidence of intent to resume use within the reasonably foreseeable future." *Id.* (quotation and citation omitted).

"If all a party had to do to avoid a holding of abandonment was to testify that he never had any intent ...  not to resume use, then no mark would ever be held abandoned." 3 J. Thomas McCarthy on Trademarks and Unfair Competition § 17:13 (4th ed. 2011) (citing *Golenpaul v. Rosett,* 174 Misc. 114, 18 N.Y.S.2d 889 (N.Y. Sup. Ct. 1940). Thus, it need not be shown that the trademark owner had any *subjective* intent to abandon the mark. *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.,* 289 F.3d 589, 596 (9th Cir. 2002) (citing McCarthy, *supra,* § 18:48) (emphasis added).

"It is well established that a trademark owner may grant a license and remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained." *Barcamerica*, 289 F.3d at 595 (quotation and citation omitted). However, "uncontrolled or 'naked' licensing may result in the trademark ceasing to function as a symbol of quality and controlled source." *Id.* at 596 (quotation and citation omitted). "Consequently, where the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Id.* (quotation and citation omitted).

In this case, Magnum shut down the Rex franchise business in 2002 and the last Rex Chicken restaurant closed–at the latest–by 2003 or 2004.  Moreover, by 2002, Magnum had discontinued the use of the Mark in favor of the Ribbon Mark, which was eventually cancelled in

19

2006.  Although Magnum, at the time of the business shutdown, considered attempting to cobrand

Rex Chicken with Little Caesars Pizza, no cobranding ever occurred.  These facts create a

presumption of abandonment of the Mark, at the latest, by 2006, when the Ribbon Mark was

canceled.  *See Emergency One,* 228 F.3d at 535.[7]

Once it has been established that the prior owners abandoned the Mark with no intention of

resuming its use in the future, the burden shifts to plaintiff to rebut the presumption that the prior

owners abandoned the mark.  *Id.* at 537.  Plaintiff has attempted to rebut the presumption of

abandonment in three ways: (1) obtaining the First Assignment and Second Assignment from Rex

Chicken LLC and having Price sign a "Clarification Statement";  (2) securing the "Affidavit and

Assignment" from Ballard; (3) asserting the dispute between the parties constitutes a valid reason

for its nonuse of the Mark.

## 1.  First and Second Assignments and "Clarification"

In the First Assignment dated March 1, 2010, Rex Chicken, LLC purported to assign the

Mark to McAuliff and Johnson. [#84, Ex. 14].  In the Second Assignment dated April 1, 2010, Rex

Chicken, LLC and Magnum purported to assign the Mark and all associated intellectual property to

---

[7]Plaintiff asserts that replacement of the Mark with the Ribbon Mark saved the Mark from abandonment.  Modernization of a logo, trademark style or trade dress which retains the commercial impression of the previous version does not result in any abandonment or loss of priority in the mark.  McCarthy *supra,* § 17:28; *Beech-Nut Packing Co. v. P. Lorillard Co.,* 299 F. 834 (D.N.J. 1924), *aff'd,* 7 F.2d 967 (3d Cir. 1925), *aff'd,* 273 U.S. 629, 71 L.Ed. 810, 47 S.Ct. 481 (1927) (holding that a party's change in a label from an old format to a new one had no effect upon its rights in the mark BEECH-NUT).  Plaintiff asserts that while the Mark and the Ribbon Mark have stylistic differences, the dominant part of the original mark–the word "Rex"–continued to be the dominant part of the new logo.  Defendants contend otherwise. However, even accepting plaintiff's argument that the Ribbon Mark was only a stylistic change, the cancellation of the Ribbon Mark in 2006 means the Mark had been abandoned at least since that date.  Thus, plaintiff's reliance on the Ribbon Mark is misplaced.

McAuliff and Johnson. [#84, Ex. 6].  Both assignments were executed by Price. [*Id.*]

Neither assignment, however, establishes either chain of title or the requisite intent to revive the Mark.  The record shows that Rex Chicken, LLC, the last registered owner of the Mark, no longer existed as an Oklahoma limited liability company by the time the assignments were executed in 2010.  It ceased to operate the Rex Chicken franchise system on November 4, 2000, allegedly transferring all rights to Magnum.  Magnum, in turn, stopped using the Mark in 2002 when it shut down the Rex franchise system, and never used the Mark again. Further, it had no intention of using the Mark again because it had switched to the Ribbon Mark.  The Ribbon Mark was canceled in 2006.

Plaintiff offers the Clarification Statement in an effort to show an intent to revive the Mark on the part of Magnum.  In this document, which was prepared by McAuliff and executed by Price *after* the First and Second Assignments, Price states, "Prior to my initial contact in 2008 with Terri McAuliff I had been exploring the future possibilities of our Rex Chicken products, concepts and applications as would any one in my position." [Doc. #84, Ex. 15, Clarification Statement].

In considering the issue of intent to resume use, courts place little weight on self-serving affidavits and statements.  *See Vais Arms,* 383 F.3d at 293-94.  "That intent is determined by an objective test is too well settled to require citation."  *Id.* at 294.  In *Vais,* the court held that  an affidavit by the former owner of a trademark  to the effect that he "hoped" to regain his health in Greece and return one day to his "craft of manufacturing muzzle brakes" did not suffice to establish intent to resume use. *Id.* The court stated, "At most, George's affidavit establishes only his subjective, uncommunicated desire not to abandon the mark, without any indication of when or how he intended to resume its commercial use; it does not establish a genuine issue as to his intent

21

to abandon." *Id.* "[T]he owner of a trademark cannot defeat an abandonment claim ... by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date." *Id.* (citing *Emergency One,* 228 F.3d at 537).

Here, the Clarification Statement appears to fall into the category of "self-serving affidavits and statements." It was executed in an effort to overcome the fact that Magnum abandoned the trademark in 2002 and made no effort to revive it until McAuliff and Johnson approached Price about acquiring the Mark.  Additionally, it contradicts Price's testimony that Magnum stopped using the Mark and had no intention of using it again in part because it had switched to the Ribbon Mark.  "[A] genuine issue of material fact cannot be established by a party contradicting his own earlier statements unless there is a plausible explanation for the incongruity." *Stanfield v. Osborne Industries, Inc.,* 52 F.3d 867, 872 (10th Cir. 1995) (quotation and citation omitted).

The court finds the First and Second Assignments and the Clarification do not overcome the presumption that the Mark was abandoned.

### 2.  Ballard Affidavit and Assignment

The Lanham Act provides:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.  If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

15 U.S.C. § 1055.  A "related company" is defined as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."  15 U.S.C. § 1127.  Thus, "[i]t is well-established

22

that a trademark owner may grant a license and remain protected provided quality control of the

goods and services sold under the trademark by the licensee is maintained." *Barcamerica,* 289 F.3d

at 595 (quotation and citation omitted).  However, if "naked," i.e., uncontrolled, licensing of a mark

occurs, then the owner will be held to have abandoned any rights in the trademark.  *Stanfield,* 52

F.3d at 871.  The Tenth Circuit explained in *Stanfield*:

> Naked (or uncontrolled) licensing of a mark occurs when a licensor allows a
> licensee to use the mark on any quality or type of good the licensee chooses.
> 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
> § 18.15, at 69 (3d ed. 1992) [hereinafter *McCarthy on Trademarks*].  Such
> uncontrolled licensing can cause the mark to lose its significance.  *Id.*  When
> "A trademark owner engages in naked licensing, without any control over
> the quality of  goods produced by the licensee, such a practice is inherently
> deceptive and constitutes abandonment of any rights to the trademark by the
> licensor."  *First Interstate Bancorp v. Stenquist,* 16 U.S.P.Q.2d (BNA) 1704,
> 1706, 1990 WL 300321 (N.D.Cal. July 13, 1990).  Thus, the licensor must
> "Take some reasonable steps to prevent misuses of his trademark in the hands
> of others.:  *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 367 (2d
> Cir. 1959).  "The critical question  ...  is whether the plaintiff sufficiently policed
> and inspected its licensee[' s] operations to guarantee the quality of the products
> [the licensee] sold."  *Id.*  Because a finding of insufficient control results in the
> forfeiture of a mark, a party asserting insufficient control by a licensor must meet
> a high burden of proof.  *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d
> 1001, 1017 (9th Cir. 1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d
> 778 (1986).

52 F.3d at 871.  In *Stanfield,* the court reviewed the license agreement and the conduct of the

parties for evidence of control.  *Id.* at 871-72.  It noted that the contract did not give the plaintiff an

express contractual right to inspect or supervise the licensee's operations in any way, and that the

licensee had the "sole discretion" to design the mark.  *Id.* at 871.  The court stated, "The absence of

an express contractual right of control does not necessarily result in abandonment of a mark, as long

as the licensor in fact exercised sufficient control over its licensee."  *Id.*  The plaintiff had "no

contact whatsoever" with the licensee after plaintiff's employment terminated.  *Id.*  Plaintiff

contended he exercised control over the licensee's use of the marks by examining a swine heating pad produced by the licensee and looking at several pet pads, and by occasionally reviewing its promotional materials and advertising. *Id.* He also claimed that his lack of knowledge of any quality control problems was evidence of his control. *Id.* The court concluded, "None of this, however, is evidence that plaintiff actually exercised control *over* [the licensee]." *Id.* at 871-72.

The court also rejected plaintiff's argument that he relied on the licensee for quality control and his reliance was sufficient to avoid a finding of a naked license. *Id.* at 872. The court stated, "In cases in which courts have found that a licensor justifiably relied on a licensee for quality control, some special relationship existed between the parties." *Id.*[8]

In this case, the Franchise Agreement included "Uniform Standards of Operation and Quality Control." [#84, Ex. 2, ¶6]. However, "[t]he crucial question when the relationship between two companies is questioned ... is, therefore, 'whether the plaintiff sufficiently policed and

---

[8]The court noted, for instance, in *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd on other grounds,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), the court had examined a cross-license between two brothers who had run a chain of restaurants together or a number of years. When they decided to divide the business, the brothers agreed both would continue to use the same trade dress in their respective restaurants. *Id.* at 1117. Because the parties had maintained a close, long-term working relationship, the court held that they could justifiably rely on each other to maintain quality. *Id.* at 1121. The Tenth Circuit in *Stanfield* also cited *Transgo ,* 768 F.2d at 1017-18, where the licensor itself manufactured at least 90% of the goods sold by its licensee, utilizing its own procedures to maintain quality. *Stanfield,* 52 F.3d at 872. And the court observed that in *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.,* 330 F.2d 667, 670 (7th Cir. 1964), "the court found that the licensor reasonably relied on the licensee to maintain quality because the parties had maintained a successful association with no consumer complaints for over forty years." *Stanfield,* 52 F.3d at 872. The court in *Stanfield* observed that in this case, the relationship between plaintiff and the licensee was "neither close nor successful" and that the parties' only contact over the preceding 20 years had been as adversaries in litigation. *Id.*

inspected its licensees' operations to guarantee the quality of the products they sold under its trademarks to the public.'  This is a question of fact, upon which the language of the agreement between the parties is not necessarily decisive."  *R.C.W., Supervisor, Inc. v. Cuban Tobacco Co.,* 220 F. Supp. 453, 461 (S.D.N.Y. 1963), citing *Dawn Donut Company,* 267 F.2d at 367.

Here, the precise nature of the relationship between Ballard and his franchisers after the death of Vernon McFarland is ambiguous at best.  Jerry Dodson, Vice President of Franchise Development for MDI, testified MDI intended to terminate Ballard's license to use the Mark in 1992 and, in furtherance of this intent, mailed a letter to Ballard on March 3, 1992, at Dollie McFarland's request, informing Ballard that the Franchise Agreement would expire one year from the expiration of the last five-year term, on May  4, 1993.  There is no evidence the one-year extension was ever executed.  Moreover, none of the registered owners of the Mark ever abided by the terms of the Franchise Agreement concerning assignment of the agreement.  Of all the purported transfers of the Franchise Agreement from Rex Chicken Company to MDI to Rex Chicken, LLC to Magnum, no notice (written or otherwise) was ever received by Ballard.  Ballard was not required to make royalty payments after MDI sold its assets to Rex Chicken, LLC, in 1993, and he testified he had never heard of Magnum or Price.  Nevertheless, Ballard continued, without objection from any of the series of franchisers, to sell Rex chicken and use the Mark.   Further, Price visited Ballard's Drive-In and spoke to Ballard in approximately 1999 or 2000.

In any event, it is clear the relationship between Ballard and Magnum, the owner of the Mark, ended in 2002, when Magnum shut down the franchise system and stopped using the Mark. Magnum's controller testified the company has done nothing to keep track of Ballard since then and he is not in Magnum's system.  It is undisputed that Ballard stopped purchasing food products from

25

the franchiser in 2002, at the latest.  Although Price testified he had eaten at Ballard's "six or seven years ago," he did not see the owner or conduct any inspection; he merely ordered chicken.  Nor are post-2000 visits by Dollie McFarland and her relatives relevant, because by 2000, neither she nor any of her relatives owned an interest in the Mark.

Citing *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 387 (5th Cir. 1977), plaintiff argues the level of control by the franchiser was sufficient because Vernon McFarland exercised oversight while he was alive and Ballard's had such a good track record, the owner of the Mark could rely on him to continue to live up to standards.  It points out that Ballard's chicken product has continuously been well-received by the public.

In *Kentucky Fried Chicken,* the defendant argued the trademark owner had forfeited the marks by exercising inadequate control in 47 states and exercising no control at all in three states. *Id.*  The court, in addressing the issue of control in 47 states, commented:

> Retention of a trademark requires only minimal quality control, for in this context we do not sit to assess the quality of products sold on the open market. We must determine whether Kentucky Fried has abandoned quality control; the consuming public must be the judge of whether the quality control efforts have been ineffectual. We find that Kentucky Fried has sufficiently overseen the operations of its franchisees.

*Id.*  The court held that since Kentucky Fried did not *own* the trademarks in the remaining three states, the fact that it exercised no control was irrelevant.  *Id.*

The facts here are distinguishable from those in *Kentucky Fried Chicken.*  This case does not involve an issue of whether the owner's exercise of control was adequate or inadequate.  The record clearly establishes that beginning in 2002, Magnum, the last owner of the Mark, exercised *no* control because it had stopped franchising Rex Chicken and intended to exit that business to focus on its Little Caesars Pizza franchise.  Plaintiff has not cited *any* case authority to support the

26

proposition that, where the franchiser exits the business and *no* control is exercised, a forfeiture can be avoided.

Plaintiff also relies on *Land O'Lakes,* 330 F.2d 667, to support its proposition that reliance on the licensee's own control over the quality of products is sufficient to avoid forfeiture. There, the defendant, Oconomowoc, starting in 1920, sold canned peas under the mark Land O'Lakes to Jones, a food broker, and later gave him an oral license to use the trademark on canned goods not produced by the defendant. *Id.* at 669. In the 1930's Jones and defendant agreed that Jones could use the trademark on any canned goods purchased from Jones by the Baltimore Wholesale Grocery Company. *Id.* Plaintiff alleged defendant abandoned its mark. The trial court dismissed the trademark infringement claim against defendant, concluding defendant's reliance on Jones's control over the quality of products should be deemed sufficient supervision to protect the quality of the goods bearing the trademark and therefore met the requirements of 15 U.S.C. § 1064(e). *Id.* at 670. The appellate court affirmed, stating, "In light of the fact that defendant's name appeared on the label used by Jones and that during the forty years of the license agreement there were no complaints about the quality of the goods, we think the finding that the arrangement with Jones was more than a naked license not effecting an abandonment of the mark was not erroneous." *Id.*

*Land O'Lakes* is distinguishable from this case. There, Oconomowoc and Jones had a 40-year relationship that was still ongoing at the time of the lawsuit. *Id.* If Vernon McFarland were still alive and his company still owned the Mark, the same might be said about the relationship, but McFarland died in 1988 and subsequently, the franchise business and Mark passed completely out of the hands of his company to Rex Chicken, LLC and then to Magnum. Further, Magnum shut down the Rex franchise business and stopped using the Mark in 2002.

27

Plaintiff cites *Transgo,* 768 F.2d 1001, in support of its argument that the relationship between Ballard and Vernon McFarland precludes a finding that Ballard operated under a naked license.  In that case, Transgo developed and marketed a line of valve body kits to solve problems with different types of automatic transmissions.  *Id.* at 1009.  The kits were marketed as "Shift Kits."  *Id.* at 1010.  By 1976, Transgo was the sole manufacturer of valve body kits for automatic transmissions of ordinary passenger cars. *Id.* at 1011.  At some point, Transgo granted an oral license to Winters Performance Products to use "Shift Kit" for products over which Transgo did not exercise quality control. *Id.* at 1017.  For 10 years starting in 1966, defendant Ajac purchased Transgo valve body replacement kits and resold them to transmission rebuilders. *Id.* at 1011.  In 1976, at the suggestion of several distributors, Ajac's parent company, Fairbanks, Inc., began to manufacture and Ajac began to sell a line of valve body kits for passenger cars using the name "Shift Kit."  *Id.*  Transgo sued Ajac and Fairbanks for, inter alia, trademark infringement. *Id.* at 1012.  Ajac contended Transgo had abandoned the mark by permitting Winters Performance to use the name for products over which Transgo did not exercise quality control. *Id.* at 1016.  The jury expressly found, however, that Transgo "exercised supervision and control adequate to ensure the quality of those products."  *Id.* at 1017.   The appellate court, in affirming the jury verdict, noted that at least 90% of the components sold by Winters Performance Products were manufactured by Transgo, and on these products, Transgo utilized its own quality control procedures at its plant. *Id.* Winters made minor part adjustments on certain Transgo kits after conferring with Transgo. *Id.*  A Shift Kit Winters made on its own was based on a prototype from Transgo, Winters worked with Transgo throughout its development, and Transgo tested individual parts of the kit.  *Id.*

Plaintiff also cites *Taco Cabana,* 932 F.2d 1113, in support of its contention that the

28

Franchise Agreement did not become a naked license.  In *Taco Cabana*, two brothers divided the

Taco Cabana restaurants they had owned for eight  years. *Id.* at 1121.  One brother retained the

name "Taco Cabana," and the other adopted the name "TaCasita."   The brothers' agreement

allowed both groups to use the same trade dress. *Id.*   The alleged infringer, Two Pesos, claimed

this constituted a "naked license" and resulted in forfeiture of trademark protection.  *Id.*  A jury

found in favor of Taco Cabana, and the appellate court, in affirming the verdict, commented:

> The purpose of the quality-control requirement is to prevent the public deception
> that would ensue from variant quality standards under the same mark or dress.
> Where the particular circumstances of the licensing arrangement persuade us that the
> public will not be deceived, we need not elevate form over substance and require
> the same policing rigor appropriate to more formal licensing and franchising
> transactions.  Where the license parties have engaged in a close working relationship, and
> may justifiably rely on each parties' intimacy with standards and procedures to
> ensure consistent quality, and no actual decline in quality standards is demonstrated,
> we would depart from the purpose of the law to find an abandonment simply for want
> of all the inspection and control formalities.

*Id.*

Both *Transgo* and *Taco Cabana* are distinguishable from this case.  Here, the "close

relationship" relied on by plaintiff was between Ballard and Vernon McFarland, and McFarland

died in 1988.  By the time Magnum shut down the Rex restaurants and stopped using the Mark in

2002, McFarland had been gone for 14 years, and ownership of the Mark had passed from MDI to

Rex Chicken, LLC, to Magnum.  Ballard did not even know the name "Magnum" and claims never

to have met Price.  Ballard was procuring his own chicken product and making his own spice

packets.  Ballard's Drive-In was not even in Magnum's system by 2002.

Finally, plaintiff relies on *Lutheran Ass'n of Missionaries & Pilots, Inc. v.  Lutheran

Assoc'n of Missionaries & Pilots, Inc.*  2004 WL 2730104 (D. Minn. Nov. 19, 2004).  In *Lutheran,*

two formerly affiliated groups claimed ownership of trademarks used by both groups. *Id.* at *1.

29

The plaintiff, LAMP-Canada, was formed by Reverend Les Stahlke in Alberta in 1970. *Id.* Defendant, LAMP-US, was formed by Ray Perry in Wisconsin in 1985. *Id.* The two were legally separate entities and had their own boards of directors, but shared an executive director and were both governed by a Statement of Relationship. *Id.* The boards met independently and jointly. *Id.* From 1985 to 2000, LAMP-US forwarded some of its donations to LAMP-Canada. From 1976 to 1985, LAMP-Canada used the "LAMP" acronym and the term "LAMPlighter" and a corresponding airplane graphic logo. *Id.* at *2. After LAMP-US was incorporated, both companies used the same marks in their operations from 1985 to 2000. *Id.*

In May 2000, the LAMP-US board of directors unilaterally decided to terminate the relationship with LAMP-Canada. *Id.* at *1. In an ensuing lawsuit, both companies claimed ownership of the marks. *Id.* at *3. LAMP-Canada argued it allowed LAMP-US to use the marks under an implied license. *Id.* at *8. LAMP-US contended it had a naked license, which resulted in abandonment of the marks by LAMP-Canada. *Id.* On summary judgment, the court ruled in favor of LAMP-Canada. *Id.* at *15. In so ruling, the court noted LAMP-Canada first established the mission of the joint ministry and LAMP-US was required to submit to the ministry when it entered the Statement of Relationship. *Id.* at *9. LAMP-Canada employed and operated the administration of the joint ministry. *Id.* at *6. Although both entities had their own boards of directors to assist in operations, neither board had the power to unilaterally dictate the direction of the mission nor annual budgets. *Id.* at *9. Rather both entities were required to comply with the terms of the Statement of Relationship, and each had the power and ability to ensure compliance with the contract. *Id.* Thus, the court concluded LAMP-Canada retained at least minimum control over the charitable services rendered by the joint mission. *Id.*

30

The facts of this case are distinguishable.  There is no question that the parties in this case had a written document which expressly created a licensor/licensee relationship.  Until Vernon McFarland died, he visited the restaurant and maintained a close relationship with the licensee.  However, after his death in 1988, ownership of the Mark passed from MDI to Rex Chicken, LLC, in 1993, and then to Magnum in 2000.  By that time, no member of the McFarland family had any ownership in the Mark.  Magnum shut down the franchise system altogether and stopped using the Mark in 2002 or–at the latest–by 2003-2004.  The passage of time, the successive transfer of ownership, the waning exercise of oversight by owners, and ultimately the cessation of the business and use of the Mark altogether weigh in favor of a conclusion that Ballard, by 2002 at the latest, had a naked license.

Finally, plaintiff contends that since Ballard's Drive-In was subject to various state laws requiring licensing and inspection, adequate supervision and inspection was provided by the Oklahoma Department of Health.  Citing the Restatement (Third) of Unfair Competition § 33, cmt.c ("The licensor's obligation of reasonable control can be satisfied through supervision or testing conducted by third persons."), and 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §18:60 (4th ed.) ("There seems to be no reason why the licensor should not be permitted to appoint a third party agent to carry out the actual inspection and evaluation of the licensee's goods and services and to measure them against the standards created or adopted by the licensor."), plaintiff argues that oversight by the Department of Health satisfies the requirement for supervision and oversight.  This argument, however, is unpersuasive.  The State Department of Health regulations are aimed toward health and food safety–not toward maintaining a certain type or quality of product.  Also, clearly the owners of the Mark never appointed the Department of

31

Health to carry out any quality control testing or evaluation of Ballard's chicken.

### 3. Nonuse Based on Current Dispute

As previously noted, the presumption of abandonment may be rebutted by a showing of a valid reason for nonuse. *See Star-Kist Foods,* 769 F.2d at 1396.  Plaintiff asserts the current dispute over ownership of the Mark constitutes such a reason.  While this dispute explains *recent* nonuse of the Mark by plaintiff, it does not explain nonuse of the Mark from 2002 (or at the latest, 2006) to 2010, when plaintiff was formed and filed this lawsuit.  The court rejects plaintiff's claim of a valid reason for nonuse of the Mark.


In conclusion, the court finds that even applying a "strict standard of proof," defendants have carried their burden of establishing the Mark was abandoned.  Plaintiff has not rebutted the presumption of abandonment.

### B.  Common Law Rights

Plaintiff contends that even if the court determines that it has no rights under the federal registration, Original Rex owns any unregistered or common law trademark rights that existed by virtue of Ballard's use of the Mark since 1977.  Unlike a 15 U.S.C. § 1114(a) claim for trademark infringement, under 15 U.S.C. § 1125, a plaintiff need not be the owner of a registered trademark in order to have standing to sue. *Stanfield,* 52 F.3d at 873.  "Nevertheless, 'standing to bring a section [1125(a)] claim requires the potential for a commercial or competitive injury.'" *Id.* (citing *Berni v. Int'l Gourmet Restaurants of Am., Inc.,* 838 F.2d 642, 648 (2d Cir. 1988)).

Plaintiff–a  company formed in 2010 *after* defendants began franchising and marketing Rex chicken–has never owned or franchised any restaurants.  Thus, it lacks standing to assert a claim for

common law infringement or unfair competition under 15 U.S.C. § 1125.

## C.  Plaintiff's 15 U.S.C. § 1125(a) False Advertising Claim

As with claims for unfair competition under the Lanham Act, in order to bring a claim for false advertising under 15 U.S.C. § 1125(a), the claimant must be in competition with the defendant and allege a competitive injury.  *Stanfield,* 52 F.3d at 873 (citing *Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1109 (9th Cir. 1992).  Plaintiff cannot establish it is in competition with defendants, and therefore, it lacks standing to assert a § 1125 false advertising claim.

## D.  Plaintiff's ODTPA Claim

The ODTPA provides remedies for "[a]ny person damaged or likely to be damaged by a deceptive trade practice of another."  78 O.S. § 54.A.  "It has been definitively established that the Deceptive Trade Practices Acts protect competing business interests."  *Thomas v. Metropolitan Life Insurance Co.,* 540 F.Supp.2d 1212,1228 (W.D. Okla. 2008) (citing *Conatzer v. American Mercury Ins. Co., Inc.,* 15 P.3d 1252, 1254 (Okla. Civ. App. 2000).  Because plaintiff has never had any actively competing franchises or stores, defendants are entitled to summary judgment on plaintiff's ODTPA Claim.

## E.  Plaintiff's Motion for Partial Summary Judgment

The first, second and fifth propositions of plaintiff's Motion for Partial Summary Judgment (i.e., that plaintiff is the owner of the Mark; that defendants have infringed the Mark; and that the Mark was not abandoned by plaintiff's predecessors), are denied.  The third and fourth propositions of the motion (that defendants' goods and services are not licensed or approved by plaintiff and are similar to and compete with goods and services sold or licensed by Original Rex through the same channels of trade; and that defendants' products and services are likely to deceive, confuse, and

mislead the public) are denied based on the court's determination that plaintiff is not the owner of the Mark because the Mark was abandoned.

## IV. Conclusion

For the foregoing reasons, defendants' Motion for Partial Summary Judgment [Doc. #84] is granted  and plaintiff's Motion for Partial Summary Judgment [Doc. #85] is denied.  Count VI of plaintiff's First Amended Complaint (state common law unfair competition) [Doc. #42] and defendant RFS's counterclaim for cancellation of the registration of the Mark [Doc. #11] remain.  A status/scheduling  conference is set for June 6, 2011, at 1:30 p.m. to address the remaining claims in the case.

ENTERED this 27th day of May, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma